UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JEREMY W. JUSTICE,

       Plaintiff,

v.                                Civil Action No. 2:08-230

BRANCH BANKING AND TRUST
COMPANY, a Corporation,
MICHAEL DALTON,
individually and as an
agent of Branch Banking and
Trust Company,

       Defendants.

MEMORANDUM OPINION AND ORDER

       Pending is plaintiff Jeremy W. Justice's motion to remand, filed April 30, 2008.[1]  Because the court lacks subject matter jurisdiction, the motion is granted.

I.

       This action was instituted in the Circuit Court of

---

[1] Also pending are defendant Branch Banking and Trust Company's motion to dismiss, filed April 9, 2008; defendant Michael Dalton's motion to dismiss, filed June 10, 2008; and plaintiff's motion to amend the complaint, filed July 1, 2008.

1

Boone County, West Virginia on February 27, 2008.  Plaintiff is a
resident of Boone County.  (Compl. ¶ 1).  Defendant Branch
Banking and Trust Company ("BB&T") is a state chartered bank,
incorporated under the laws of  North Carolina.  (Not. or Rem. ¶¶
6 and 11).  BB&T's principal place of business is also in North
Carolina.  (Id. ¶ 6).  Defendant Michael Dalton ("Dalton") is an
employee of BB&T and is a resident of West Virginia.  (Compl. ¶
3; Not. of Rem. ¶ 8).  Invoking the court's diversity
jurisdiction, and stating that Dalton has been fraudulently
joined, BB&T removed on April 2, 2008.  In order to reach the
defendants' motions to dismiss, and plaintiff's motion to amend,
this court must have subject matter jurisdiction.  The existence
of such jurisdiction is contingent upon the defendants' ability
to show that Dalton was fraudulently joined.  In determining
"whether an attempted joinder is fraudulent, the court is not
bound by the allegations of the pleadings, but may instead
consider the entire record, and determine the basis of joinder by
any means available."  Mayes v. Rapoport, 198 F.3d 457. 464 (4th
Cir. 1999) (internal quotation marks omitted).[2]  The following

---

[2] While the issue has not been addressed by the Fourth
Circuit Court of Appeals, the Fifth Circuit has held that while
evidence beyond the pleadings is to be considered, limits do
exist.  That court stated:
    [o]ur Court has endorsed a summary judgment-like
    procedure for reviewing fraudulent joinder claims.

facts are therefore taken from the complaint, as well as other documents and affidavits submitted by the parties.

On or about October 15, 2004, plaintiff purchased a 2002 Chevrolet Silverado ("the Silverado"). (Compl. ¶ 7). To finance the purchase, plaintiff obtained a loan from Chase Auto Finance. (Id.) On or about June 29, 2005, plaintiff refinanced his purchase of the Silverado, procuring a loan from BB&T in the amount of $18,270.35. (Id. ¶ 8). In conjunction with the loan, Dalton, BB&T's employee and agent, offered and sold the plaintiff a "Payment Protection Contract" on BB&T's behalf. (Id. ¶ 9). That contract, which is titled, "BB&T Payment Protection Contract - Installment Loans," provides for the cancellation or reduction of loan payments in the event plaintiff, as debtor, dies, becomes terminally ill, or becomes disabled. (Contract, Mot. to Remand, ex. 4). The three page contract, which is signed by the plaintiff, provides that its purchase is optional, and states,

––––––––––––––––––

> Thus, while we have frequently cautioned the district courts against pretrying a case to determine removal jurisdiction, federal court may consider summary judgment-type evidence such as affidavits and deposition testimony when reviewing a fraudulent joinder claim. Post-removal filings may not be considered, however, when or to the extent that they present new causes of action or theories not raised in the controlling petition filed in state court.

Griggs v. State Farm Lloyds, 181 F.3d 694, 700 (5th Cir. 1999) (internal citation and quotation marks omitted).

3

among other things, the fee the debtor will incur and the
conditions under which the debtor's loan payments will be
canceled or reduced.  (Id.)  The contract does not contain the
term "insurance."  Plaintiff, however, has submitted an affidavit
stating that prior to entering into the contract,

> I was informed by the loan officer, Michael Dalton,
> that I needed to purchase an insurance plan to pay the
> debt if I became disabled or was injured at work.  I
> was also led to believe that I was purchasing an
> insurance policy and that this insurance coverage would
> protect me from any loss due to the inability to pay
> the loan if I became disabled or was injured at work.
> I purchased this policy because I was led to believe
> that this insurance would cover this type of loss.
>
> . . .
>
> I purchased this coverage because I was lead to believe
> that this insurance was necessary to obtain the loan
> and to protect against any loss by paying the loan off
> upon my disability.

(Justice Aff. ¶ 1, Mot. to Remand, ex. 1).  In consideration for
the benefits provided by the Payment Protection Contract,
plaintiff incurred a fee of $1,470.75.  (Compl. ¶ 11; Contract,
Mot. to Remand, ex. 4).  According to the complaint, this fee was
incorporated into the total loan amount and was included in
plaintiff's monthly loan payments.  (Compl. ¶ 11).

        Plaintiff is a coal miner.  In October of 2005, while
working in that capacity, plaintiff was injured and unable to
work for approximately one month.  (Id. ¶ 13).  During this

**4**

period of disability, plaintiff continued to make timely loan
payments to BB&T.  (Id.)  On or about January 29, 2009, plaintiff
once again suffered an injury at work.  (Id. ¶ 14).  As a result
of his injury, plaintiff has been disabled and unable to work.
(Id.)  Under the terms of the Payment Protection Contract, unless
the debtor has been "currently employed at a full time job and
working at least thirty (30) hours per week for at least 6
consecutive months immediately prior to the date the Debtor's
Disability begins," loan payments are not canceled or reduced on
disability grounds.  (Contract, Mot. to Remand, ex. 4).[3]
According to the complaint, excepting the approximately one month
period in October of 2005, plaintiff worked full time during the
six months prior to his injury in January of 2006, averaging
30.58 hours of work per week.  (Compl. ¶ 15).  The Payment
Protection Contract was in effect as of the date of plaintiff's
second injury.  (Id. ¶ 16).  Plaintiff states that he has
complied with all conditions contained in the Payment Protection
Contract, including filing a claim for benefits.  (Id. ¶ 17).
BB&T, however, has denied plaintiff's claim to the benefits of
the contract, asserting that plaintiff did not work thirty hours

---

[3] Employment interruptions caused by lockout, general strike
or unionized labor dispute are expressly excluded.  (Contract,
Mot. to Remand, ex. 4).

per week for at least six months prior to the date plaintiff's disability began.  (<u>Id.</u> ¶ 18).

BB&T has repossessed and resold the 2002 Chevrolet Silverado.  (<u>Id.</u> ¶ 19).  The proceeds of the sale did not satisfy the outstanding loan balance.  As a result, BB&T has demanded payment of $7,033.34, the amount of the outstanding loan balance in addition to the expense of repossession.  (<u>Id.</u>; 5/16/07 BB&T Letter, Mot. to Remand, ex. 3).

Plaintiff's five-count complaint sets forth the following claims: Count I, Breach of Contract; Count II, Violations of the West Virginia Unfair Trade Practices Act and Insurance Regulations;[4] Count III, Common Law Bad Faith; Count IV, Reasonable Expectations; Count V, Declaratory Judgment.[5]

---

[4] The title to Count II is "Unfair Claims Practices Act and Insurance Regulations."  This appears to be a combination of the West Virginia Unfair Trade Practices Act, W. Va. Code §§ 33-11-1 though 10, and what is, at times, referred to as the Unfair Claims Settlement Practices Act, § 33-11-4.  The substantive allegations contained in Count II show that plaintiff's claim is under § 33-11-4.  For simplicity's sake, the claim in Count II will be referred to as plaintiff's "§ 33-11-4 claim."

[5] As discussed more fully below, the parties dispute whether Counts II through IV are directed only at BB&T or both defendants.

II.

The fraudulent joinder standard is well settled.  Our court of appeals lays a "heavy burden" upon a defendant removing a case on such grounds:

> In order to establish that a nondiverse defendant has been fraudulently joined, the removing party must establish either: [t]hat there is <u>no possibility</u> that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or [t]hat there has been outright fraud in the plaintiff's pleading of jurisdictional facts.

<u>Mayes v. Rapoport</u>, 198 F.3d 457, 464 (4th Cir. 1999) (emphasis added) (quoting <u>Marshall v. Manville Sales Corp.</u>, 6 F.3d 229, 232 (4th Cir. 1993)).  The applicable standard "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss[.]"  <u>Hartley v. CSX Transp., Inc.</u>, 187 F.3d 422, 424 (4th Cir. 1999).

As the decision in <u>Hartley</u> illustrates, fraudulent joinder claims are subject to a rather black-and-white analysis in this circuit.  Any shades of gray are resolved in favor of remand.  Indeed, "the defendant must show that the plaintiff cannot establish a claim against the nondiverse defendant even after resolving all issues of fact and law in the plaintiff's favor."  <u>Mayes</u>, 6 F.3d at 232.  At bottom, a plaintiff need only

7

demonstrate a "glimmer of hope" in order to have his claims

remanded:

> CSX contests these points and we are unable to resolve
> them with the snap of a finger at this stage of the
> litigation. Indeed, these are questions of fact that
> are ordinarily left to the state court jury.
>
> <u>In all events, a jurisdictional inquiry is not the
> appropriate stage of litigation to resolve . . .
> various uncertain questions of law and fact</u>. Allowing
> joinder of the public defendants is proper . . .
> because courts should minimize threshold litigation
> over jurisdiction. Jurisdictional rules direct judicial
> traffic. They function to steer litigation to the
> proper forum with a minimum of preliminary fuss. The
> best way to advance this objective is to accept the
> parties [as] joined . . . unless joinder is clearly
> improper. To permit extensive litigation of the merits
> of a case while determining jurisdiction thwarts the
> purpose of jurisdictional rules.
>
> * * *
>
> <u>We cannot predict with certainty how a state court and
> state jury would resolve the legal issues</u> and weigh the
> factual evidence in this case. <u>Hartley's claims may not
> succeed ultimately, but ultimate success is not
> required . . . . Rather, there need be only a slight
> possibility of a right to relief</u>. Once the court
> identifies this glimmer of hope for the plaintiff, the
> jurisdictional inquiry ends.

<u>Hartley</u>, 187 F.3d at 425-26 (emphasis added).

III.

A. Removal Process

BB&T removed this action prior to Dalton being served. Dalton was, however, timely served with process on May 21, 2008. (Return of Service); Fed. R. Civ. P. 4(m).  Following service, Dalton consented to removal, joining and adopting the assertions made in BB&T's notice of removal.  (Dalton Consent to Rem. at 1). Dalton was served after BB&T filed its response to plaintiff's motion to remand, and Dalton's consent came after plaintiff's reply.  BB&T, mistakenly, makes much of the fact Dalton was yet to be served at the time of removal.

BB&T characterizes plaintiff's argument as being that removal was "inappropriate because BB&T failed to obtain the consent of named defendant Michael Dalton."  (BB&T Resp. to Mot. to Rem. at 2).  Plaintiff indeed states that removal requires the consent of all defendants.  (Mot. to Rem. at 4).  Plaintiff, however, also states that "[t]o avoid this requirement and to manipulate jurisdiction, BB&T alleges fraudulent joinder."  (Id.)

For removal from state to federal court to be appropriate, the federal court must be possessed of original

9

jurisdiction.  28 U.S.C. § 1441(a).  See Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987) ("Only state-court actions that originally could have been filed in federal court may be removed to a federal court by the defendant.").  In the instant action, the only possible basis for this court's original jurisdiction is diversity of citizenship, as provided by § 1332(a).  "A case falls within . . . [a] federal district court's 'original' diversity 'jurisdiction' only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same state."  Wis. Dep't of Corrs. v. Schacht, 524 U.S. 381, 388 (1998).  Diversity of citizenship must be established at the time of removal.  Higgins v. Williams, 863 F.2d 1162, 1166 (4th Cir. 1998).  The Supreme Court "has indicated that a defendant cannot remove a case that contains some claims against 'diverse' defendants as long as there is one claim brought against a 'nondiverse' defendant."  Schacht, 524 U.S. at 388 (citing, Caterpillar Inc. v. Lewis, 519 U.S. 61, 68-69 (1996)).  See also 14B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3723 (3d ed. 2008) ("A party whose presence in the action would destroy diversity must be dropped formally as a matter of record to permit removal to federal court.  It is insufficient, for example, that service of process simply has not been made on a

nondiverse party; the case may not be removed until that party
has been dismissed from the case.").

Additionally, as a general rule, all defendants must
consent to removal.  § 1446(a).  <u>See</u> <u>Chicago, Rock Island & Pac.
Ry. Co. v. Martin</u>, 178 U.S. 245, 247 (1900) ("It thus appears on
the face of the statute that if a suit arises under the
Constitution or laws of the United States, or if it is a suit
between citizens of different States, the defendant, if there be
but one, may remove, or the defendants, if there be more than
one."); <u>Fleming v. United Teacher Assocs.</u>, 250 F. Supp. 2d 658,
663 (S.D. W. Va. 2003) ("the general rule requires all defendants
to join in a removal petition."); 16-107 GEORGENE VAIRO, MOORE'S
FEDERAL PRACTICE – CIVIL § 107.11 (2008) ("In general, all defendants
must join the notice of removal.").  As plaintiff implicitly
recognizes, however, while

> as a general rule, removal requires the consent of all
> co-defendants.  In cases involving alleged improper or
> fraudulent joinder of parties . . . application of this
> requirement to improperly or fraudulently joined
> parties would be nonsensical, as removal in those cases
> is based on the contention that no other proper
> defendant exists.

<u>Jernigan v. Ashland Oil, Inc.</u>, 989 F.2d 812, 815 (5th Cir. 1993).
To avoid such a nonsensical result, "a removing party need not
obtain the consent of a co-defendant that the removing party

11

contends is improperly joined." <u>Rico v. Flores</u>, 481 F.3d 234,
239 (5th Cir. 2007). <u>See</u> <u>Balzik v. County of Dauphin</u>, 44 F.3d
209, 213 n.4 (3d Cir. 1995) ("The unanimity rule may be
disregarded where . . . a defendant has been fraudulently
joined."); <u>Polyplastics, Inc. v. Transconex, Inc.</u>, 713 F.2d 875,
877 (1st Cir. 1983) ("A party fraudulently joined to defeat
removal need not join in a removal petition, and is disregarded
in determining diversity of citizenship."); <u>Fleming</u>, 250 F. Supp.
2d at 663 ("While the general rule requires all defendants to
join in a removal petition, an exception is made in the case of
fraudulent joinder."); <u>Palmquist v. Conseco Med. Ins. Co.</u>, 128 F.
Supp. 2d 618, 621 n.2 (D.S.D. 2000) ("the unanimity rule may be
disregarded . . . where a defendant has been fraudulently
joined."). Because BB&T contends that Dalton has been
fraudulently joined, (Not. of Rem. ¶ 8), his consent to removal
was not required; in any event, Dalton has now been served and
has consented to removal.

Simply because, as a procedural matter, Dalton's
consent to removal was unnecessary, does not mean that this court
has - or ever had - jurisdiction. Defendant argues that under §
1441(b), "until a defendant is properly joined and served, his
residency is irrelevant. . . . Thus, this court need only

consider the residences of properly joined and served defendants in determining whether to retain jurisdiction." (Resp. to Mot. to Rem. at 2). Section 1441(b) provides that,

> [a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

The latter sentence of § 1441(b) states, what is often times referred to as, "the forum defendant rule." Generally, the forum defendant rule provides that when a case is filed in state court, if any defendant having been "properly joined and served" is a citizen of the state in which the action is brought, the action cannot be removed despite the existence of complete diversity.[6]

---

[6] One noted treatise provides the following explanation: Despite the applicability of the general rules governing diversity of citizenship jurisdiction to cases removed to federal court, removal jurisdiction over diversity actions is more limited than jurisdiction over diversity of citizenship cases originally brought in federal court. This is because Section 1441(b) explicitly provides, and the cases uniformly hold, that removal to federal court based on diversity of citizenship is available only if none of the parties in interest properly joined and served as a defendant is a citizen of the state in which the action is brought; that limitation is not applicable to the removal of federal question cases or the federal courts' original subject matter jurisdiction over diversity cases.
14B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §

Yet undecided in this circuit, "eight of the nine circuits that
have decided the issue hold that the forum defendant rule is
procedural."  Lively v. Wild Oats Mkts., Inc., 456 F.3d 933, 936
(9th Cir. 2006) (finding the forum defendant rule to be
procedural and collecting cases).  Assuming the rule is in fact
procedural, it could in no way create jurisdiction.  More
importantly, however, is the fact that the instant case is not
one where diversity exists, but one of the defendants is a
citizen of the forum state.  Rather, unless Dalton has been
fraudulently joined, complete diversity is lacking, and this
court does not have jurisdiction.  As explained by the Fifth
Circuit, a defendant's

> non-diverse citizenship cannot be ignored simply
> because he was an unserved defendant.  A non-resident
> defendant cannot remove an action if the citizenship of
> any co-defendant, joined by the plaintiff in good
> faith, destroys complete diversity, regardless of
> service or non-service upon the co-defendant. Whenever
> federal jurisdiction in a removal case depends upon
> complete diversity, the existence of diversity is
> determined from the fact of citizenship of the parties
> named and not from the fact of service.

New York Life Ins. Co. v. Deshotel, 142 F.3d 873, 883 (5th Cir.
1998).  See Pullman Co. v. Jenkins, 305 U.S. 534, 541 (1931)
("But the rule is otherwise where a non-separable controversy

─────────────

3723 (3d ed. 2008).

involves a resident defendant.  In that case the fact that the
resident defendant has not been served with process does not
justify removal by a non-resident defendant."); Oliver v. Am.
Motors Corp., 616 F. Supp. 714, 717 (E.D. Va. 1985) ("the fact
that service has not yet been made on the resident defendant is
insufficient to allow his citizenship to be disregarded.").
Thus, while removal was procedurally proper despite the fact
Dalton had not been served, the lack of service did not, even for
a moment, invest this court with subject matter jurisdiction.
Given that "[d]iversity must be established at the time of
removal," Higgins, 863 F.2d at 1167, this court must look to the
state of affairs existing at that time to determine whether
Dalton has been fraudulently joined.  If, and only if, Dalton was
fraudulently joined can this court assume jurisdiction.  See Fila
v. Norfolk S. Ry. Co., 336 F.3d 806, 809 (8th Cir. 2003) ("When,
as here, the respondent has joined a non-diverse party as a
defendant in its state case, the petitioner may avoid remand - in
the absence of a substantial-federal question - only by
demonstrating that the non-diverse party was fraudulently
joined.").[7]

_____

  [7] In its response to plaintiff's motion to remand, BB&T
argues, incorrectly, that prior to Dalton being served "any
dispute regarding whether Dalton's joinder is fraudulent is
premature and not ripe for resolution by this Court."  (Resp. to

15

B. Fraudulent Joinder


        BB&T's argument is two-fold.  The bank's first contention is that plaintiff's claims in Counts II through IV are directed solely at BB&T and therefore can not destroy diversity. (Not. of Rem. ¶¶ 9, 14-18).  Next, BB&T argues that even if all plaintiff's claims are directed at both defendants, it is impossible for plaintiff to prevail against Dalton.  (<u>Id.</u> ¶ 9).


1. Section 33-11-4


        In an attempt to show that the complaint creates a possibility of relief against Dalton, plaintiff's motion to remand focuses almost exclusively on the § 33-11-4 claim.  (Mot. to Rem. 6-10).  BB&T argues, among other things, that the § 33-

---

Mot. to Rem. at 4).  Given this misunderstanding, BB&T failed to present any argument regarding fraudulent joinder in its response, but instead stated that "[i]f Dalton is subsequently served, BB&T would be pleased to present its arguments as to fraudulent joinder for the courts consideration, as it did in its Notice of Removal."  (<u>Id.</u>)  Sufficient argument is presented in BB&T's notice of removal to allow the court to resolve the issue of fraudulent joinder.  Indeed, the court would be required to resolve the issue in the absence of any argument as "lack of subject matter jurisdiction is an issue that requires sua sponte consideration when it is seriously in doubt."  <u>Cook v. Georgetown Steel Corp.</u>, 770 F.2d 1272, 1274 (4th Cir. 1985).

16

11-4 claim is not directed at Dalton and therefore cannot destroy
diversity.  (Not. of Rem. ¶ 14).  A review of the complaint shows
that Count II, plaintiff's § 33-11-4 claim, is directed solely at
BB&T and therefore does not afford a basis for remand.

The complaint demands judgment against the "defendants"
in Counts I and IV.  (Compl. ¶¶ 26 and 51).  Plaintiff's demands
in Counts II, III, and V, however, are directed at the
"defendant."  (Id. ¶¶ 37, 44, 57).  The substantive allegations
in Counts I and IV include references to the acts of both
defendants.  (Id. ¶¶ 20-25; 45-50).  The plural "defendants" is
used only in those counts.  On the other hand, the substantive
allegations in Counts II, III, and V refer only to acts of the
"defendant."  (Id. ¶¶ 27-36; 38-43; 52-57).  Thus, the demands
for judgment in Counts I and IV are consistent with the
substantive allegations contained therein.  The same goes for
Counts II, III, and V.

Setting forth the jurisdictional facts, and introducing
the parties, the complaint states:

>    2.  Defendant, Branch Banking and Trust ("BB&T"), is a
>        corporation that engages in financial transactions
>        in the State of West Virginia, including
>        conducting transactions in its branch office in
>        Boone County, West Virginia.

17

3. The defendant, Michael Dalton, upon information and belief, was at all relevant times herein, a resident of Boone County West Virginia.

(Id. ¶¶ 2-3).  Throughout the complaint, whenever the word "defendant" is used on its own, the reference is clearly to BB&T. The only time the word "defendant" is used in the singular to describe Dalton, the complaint states "Defendant Michael Dalton." (Id. ¶ 46).  On numerous occasions, the complaint refers to the "defendant" acting though its agents.  (Id. ¶¶ 10, 12, 46). These references are surely not to Dalton.  The allegations contained in Count II are as follows,

27. Plaintiff restates and incorporates by reference the allegations contained in paragraphs one (1) though twenty-five (25) as if fully set forth herein.

28. The Unfair Trade Practices Act of West Virginia, West Virginia Code §33-11-1 et seq. and more specifically, the Unfair Claims Settlement Practices Act, West Virginia Code §33-11-4, sets out certain prohibitive conduct that insurance companies doing business in the State of West Virginia are required to refrain from.

29. The Payment Protection Contract is an insurance contract as that term is understood under the Unfair Claims Settlement Practices Act, and BBT, by marketing, selling and adjusting claims made pursuant to the Payment Protection Contract, was acting as an insurer in the state of West Virginia.

30. Defendant violated the West Virginia Unfair Trade Practices Act in the handling of Plaintiffs claim for benefits.

31. Defendant, in its violations of the Unfair Claims

18

Settlement Practices Act, acted with actual malice.

32. Defendant's violations of the Unfair Trade Practices
    Act have occurred with such frequency as to amount to
    general business practices.

33. Plaintiffs [sic] has completed and performed all
    conditions of the contract or contracts on his part to
    be performed.

34. Plaintiff has been forced to sue [to] recover the
    benefits under the Payment Protection Contract due to
    Defendant's failure to honor the insurance contract.

35. Defendant, upon information and belief, individually
    and through its agents, violated various provisions of
    the West Virginia Code of States Rules as they relate
    to the selling and/or handling of insurance.

36. As a direct and proximate result of Defendant's
    violation of the Unfair Trade Practices Act and various
    insurance regulations, Plaintiff has suffered extreme
    aggravation, emotional distress, pain and suffering,
    mental anguish, embarrassment, economic loss, and
    inconvenience, attorneys fees, costs and expenses.

(Compl. ¶¶ 30-36).  Plaintiff's contention that the "complaint

contains typographical errors referring to Defendant," simply

cannot be accepted.  (Mot. to Rem. at 7 n.5).[8]  While "[a]ll

doubts arising from defective, ambiguous and inartful pleadings

_____

[8] Plaintiff's response to Dalton's motion to dismiss also
attempts to characterize the complaint's references to
"defendant" and "defendants" as "grammatical errors and
misnomers."  (Resp. to Dalton Mot. to Dismiss at 9-10).
Plaintiff's counsel goes so far as to blame these so-called
"scrivener's errors" on former counsel despite the fact that
former counsel is a member of current counsel's law firm.  (Id.
at 10).  While, as argued by the plaintiff, "[d]efendants cannot
offer their own interpretation or convoluted speculation as to
Plaintiff's true intent," (Id. at 9), neither can plaintiff alter
the allegations contained in the complaint by arguing, in
essence, "I didn't mean it."

[in a removed case] should be resolved in favor of the retention of state court jurisdiction." <u>Wilkinson v. Shackelford</u>, 478 F.3d 957, 964 (8th Cir. 2007) (quoting <u>Greenshields v. Warren Petroleum Corp.</u>, 248 F.2d 61, 65 (10th Cir. 1957), plaintiff must not be allowed to re-plead the complaint in an attempt to divest this court of jurisdiction by hindsight.

Plaintiff's use of the word "defendant" in Count II when juxtaposed with the use of the word "defendants" in Counts I and IV of the complaint is clear evidence that plaintiff's § 33-11-4 claim is directed only at BB&T.  Counts III and V must be similarly construed.  BB&T concedes that Count I, alleging breach of contract, is directed at both defendants.  (Not. of Rem. ¶ 12).  As to plaintiff's reasonable expectations claim in Count IV, BB&T remarks in passing that "the Plaintiff does not clearly allege that Dalton violated the doctrine of Reasonable Expectations."  (<u>Id.</u> ¶ 18).  Count IV's allegations are far from a model of clarity.  As noted above, however, the demand for judgment in Count IV is directed against "the Defendants." (Compl. ¶ 51).  Further, Count IV states that plaintiff's damages are the "result of the Defendants' actions."  (<u>Id.</u> ¶ 50).  In light of the rule that removal jurisdiction is to be strictly construed,  <u>Md. Stadium Auth. v, Ellerbe Beckett, Inc.</u>, 407 F.2d

255, 260 (4th Cir. 2005), Count IV must be held to assert a claim against both defendants.  It remains to be determined, therefore, whether Counts I or IV of the complaint offer a "glimmer of hope" that plaintiff will recover against Dalton.  <u>Hartley</u>, 187 F.3d at 426.


2. Reasonable Expectations


Under the law of West Virginia, "[i]n order to recover damages based on an expectation of insurance, a plaintiff must prove that the insurer created a reasonable expectation of insurance."  <u>Keller v. First Nat'l Bank</u>, 403 S.E.2d 424, 428 (W. Va. 1991).  The genesis of the reasonable expectations claim is in the "traditional rule that any ambiguities in an insurance policy . . . [should] be resolved in favor of the insured."  <u>Id.</u> at 429 (quoting <u>Stanley v. Mun. Mut. Ins. Co. of W. Va.</u>, 282 S.E.2d 56, 59 (W. Va. 1981)).  It is undisputed that in order to recover under the doctrine of reasonable expectations, a contract of insurance must be at issue.  (Mot. to Rem. at 5-6; Not. of Rem. ¶ 18).  According to BB&T, however, the Payment Protection Contract is not a contract of insurance and therefore recovery against Dalton is precluded.  (Not. of Rem. ¶ 18).  BB&T further

contends that, as a general rule, the doctrine of reasonable expectations applies only when an ambiguity exists in the insurance contract.  (Id.)  The argument goes that because "[t]here is no allegation in the Complaint that the Payment Protection Contract is ambiguous," it is impossible for plaintiff to recover against Dalton.  (Id.)

Contracts like the Payment Protection Plan are known as "debt cancellation contracts" or "debt cancellation agreements." Deceptive in its simplicity, W. Va. Code § 33-1-1 provides that, "[i]nsurance is a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies."  Generally, insurance "can be variously defined with no suitable definition for all purposes and situations."  1-1 APPLEMAN ON INSURANCE § 1.4 (2d 2008).  The Supreme Court of Appeals of West Virginia has never considered whether a debt cancellation contract is, or is not, a contract of insurance. Beyond concurring in the proposition that "[i]nsurance policies . . . are generally issued by third parties and are based on a theory of distributing risk among many customers," Riffe v. Home Finders Assoc., Inc., 517 S.E.2d 313, 318 (W. Va. 1999) (quoting Griffin Sys., Inc. v. Washburn, 505 N.E.2d 1121, 1124 (Ill. App. Ct. 1987)), the Supreme Court of Appeals has offered no guidance

22

as to how to determine whether a contract constitutes insurance.
Consequently, this court finds itself in relatively uncharted
waters as far as the law of West Virginia is concerned.

BB&T points to <u>First Nat'l Bank of E. Ark. v. Taylor</u>,
907 F.2d 775 (8th Cir. 1990) for the proposition that "debt
cancellation contracts are not insurance."  (Not. of Rem. ¶ 11).
BB&T's characterization of <u>Taylor</u>, however, goes too far.  <u>Taylor</u>
determined that for purposes of the National Bank Act, 12 U.S.C.
§§ 21 et seq., debt cancellation contracts "do not constitute the
'business of insurance' under the McCarran-Ferguson Act," 15
U.S.C. § 1011 et seq.  <u>Taylor</u>, 907 F.2d at 779.  This being the
case, the Eighth Circuit Court of Appeals held that the Arkansas
Commissioner of Insurance could not prevent "either by direct
coercion or license requirement" a national bank from entering
into debt cancellation contracts.  <u>Id.</u> at 780.  This conclusion
says little about whether a debt cancellation contract offered by
a state chartered bank such as BB&T is a contract of insurance
for purposes of state law.  In fact, <u>Taylor</u> does BB&T's argument
more harm than good.  The court stated,

> [w]e acknowledge that in addition to the Commissioner a
> few state appellate courts have found debt cancellation
> contracts to fall within their states' definitions of
> "insurance." See <u>Ware v. Heath</u>, 237 S.W.2d 362 (Tex.
> Civ. App. 1951); <u>Attorney Gen. ex rel. Monk v. C.E.</u>

23

> __Osgood Co.__, 249 Mass. 473, 144 N.E. 371 (1924); __State__
> __v. Beardsley__, 88 Minn. 20, 92 N.W. 472 (1902); see also
> __United Sec. Life & Trust Co. v. Bond__, 16 App. D.C. 579
> (1902). However, state law defining insurance is not
> controlling on the issue of whether an activity falls
> within the "business of insurance" as that term is used
> in the McCarran-Ferguson Act. __SEC v. Variable Annuity__
> __Life Ins. Co.__, 359 U.S. 65, 69, 3 L. Ed. 2d 640, 79 S.
> Ct. 618 (1959).

__Id.__ at 780 n.8.  Unlike __Taylor__, state law controls this action.

As discussed below, the fact that courts of other states have

found debt cancellation contracts to be insurance militates in

favor of finding that plaintiff has stated a possible claim

against Dalton.


        BB&T's reliance on 12 C.F.R. § 37.1 is similarly

misguided.  (Not. of Rem. ¶ 11).  That regulation, which became

effective in 2003, and was promulgated by the Office of the

Comptroller of Currency ("OCC"), provides,

> (a) Authority. A national bank is authorized to enter
> into debt cancellation contracts and debt suspension
> agreements and charge a fee therefor, in connection
> with extensions of credit that it makes, pursuant to 12
> U.S.C. 24(Seventh).

> (b) Purpose. This part sets forth the standards that
> apply to debt cancellation contracts and debt
> suspension agreements entered into by national banks.
> The purpose of these standards is to ensure that
> national banks offer and implement such contracts and
> agreements consistent with safe and sound banking
> practices, and subject to appropriate consumer
> protections.

24

(c) Scope. This part applies to debt cancellation contracts and debt suspension agreements entered into by national banks in connection with extensions of credit they make. National banks' debt cancellation contracts and debt suspension agreements are governed by this part and applicable Federal law and regulations, and not by part 14 of this chapter or by State law.

§ 37.1.[9]  This is merely a restatement of <u>Taylor</u>.  In enacting the regulation, the OCC stated that "[t]his final rule, together with any other applicable requirements of Federal law and regulations, are intended to constitute the entire framework for uniform national standards for DCCs[10] and DSAs[11] <u>offered by national banks</u>."  67 Fed. Reg. 58962, 58964 (Sept. 19, 2002) (emphasis added).  <u>Taylor</u> and § 37.1, therefore, do not settle the question of whether the Payment Protection Contract offered by BB&T constitutes insurance as a matter of West Virginia law.

     While also not controlling, another federal regulation recognizes that debt cancellation contracts may be contracts of

_____

[9] 12 C.F.R. § 37.2(f) defines "debt cancellation contract" as "a loan term or contractual arrangement modifying loan terms under which a bank agrees to cancel all or part of a customer's obligation to repay an extension of credit from that bank upon the occurrence of a specified event. The agreement may be separate from or a part of other loan documents."

[10] Debt cancellation contracts.

[11] Debt suspension agreements.

insurance under state law.  Regulation Z, which implements the
Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq., and is
promulgated by the Board of Governors of the Federal Reserve
System ("Board of Governors"), regulates fees charged in
connection with debt cancellation contracts "whether or not debt
cancellation coverage is insurance under applicable law."  12
C.F.R. § 226.4(b)(10).  In proposing an amendment to § 226.4, the
Board of Governors recognized that "[i]n some states, debt
cancellation agreements may be regulated as or otherwise
considered insurance."  60 Fed. Reg. 62764, 62764 (Dec. 7, 1995).
Similarly, while entertaining a challenge to § 226.4(d)(3), which
provides for the uniform treatment of debt cancellation fees and
credit insurance premiums under the TILA, the United States
District Court of the District of Columbia noted "that debt
cancellation agreements are considered insurance in some states,
but not others."  Am. Bankers Ins. Group, Inc. v. Bd. of
Governors of the Fed. Reserve Sys., 3. F. Supp. 2d 37, 39 (D.D.C.
1998).  Thus, while in certain contexts the federal government
has chosen not to regulate debt cancellations contracts as
insurance, consistent with the principles of federalism, the
states are certainly free to do so.

        Some states have exercised that freedom.  According to

26

one count, "[o]ver a dozen states, including New York, still take
the express position that DCCs and DSAs are to be regulated as
insurance."  James M. Cain, <u>Financial Institution Insurance
Activities--Time for a GLB Act Upgrade?</u>, 58 Bus. Law. 1339, 1345
(2003).  <u>See</u> <u>also</u> 1 Lee R. Russ & Thomas F. Segalla, Couch on Insurance §
1:23 (3d 2008) ("An undertaking on the part of one selling
merchandise on the installment plan to cancel the debt in case
the buyer dies before the installments are paid constitutes
insurance, as do an agreement to cancel the balance due on a loan
in the event of death or disability of the borrower.").  In
<u>Douglass v. Dynamic Enters., Inc.</u>, 869 S.W.2d 14 (Ark. 1994) the
Supreme Court of Arkansas determined that a debt cancellation
contract extinguishing "the outstanding debt on a vehicle
purchased and financed though . . . [the defendant] if the
vehicle is wrecked and totalled, or stolen though no fault or
negligence of the purchaser" to be a contract of insurance.  <u>Id.</u>
at 15.[12]  In so determining, the court deemed the fact that the
defendant was motivated by profit in offering the contract to be
of significance.  <u>Id.</u> at 16.

---

[12] In reaching this conclusion, the court distinguished
<u>Taylor</u>, 907 F.2d 775, stating that the "decision is narrowly
limited, and involved federal activity and a matter of federal
law.  While persuasive, we do not find federal decisions
authoritative in cases involving interpretation of state law."
<u>Douglass</u>, 869 S.W.2d at 17.

Similarly, in Luc Leasing Corp. v. Muhl, 659 N.Y.S.2d 422 (N.Y. Sup. Ct. 1997) a corporation engaged in the leasing of automobiles sought a declaration that a "lease completion waiver" ("LCW") it proposed to offer did not constitute insurance.  The LCW provided that "plaintiff would waive all further monthly lease payments in the event the lessee dies or becomes disabled during the term of the lease."  Id. at 422.  Plaintiff brought the action in response to a letter sent by the New York Superintendent of Insurance stating, "[i]t has long been the consistent position of this Department that a debt cancellation contract, under which the debt cancellation is dependent upon the happening of a fortuitous event constitutes the doing of an insurance business in this state."  Id.  Denying the plaintiff's motion for summary judgment, the court sua sponte granted the defendant "declaratory judgment that the LCW option proposed by the plaintiff would constitute the doing of an insurance business," as defined by New York law.  Id. at 424.  Admittedly, these cases are distinguishable.  In light of defendant's heavy burden, however, they are of some limited guidance.  At a minimum, Douglass and Luc Leasing are valuable as evidence of the simple fact that courts of other states have found debt cancellation contracts to constitute insurance.  Given that the

case law of West Virginia offers little guidance as to what
constitutes insurance - and no guidance as to the proper
characterization of debt cancellation contracts - it is possible
that the courts West Virginia will come to the same conclusion.

In further support of its argument that the Payment
Protection Contract is not a contract of insurance, BB&T cites to
a January 8, 2008 letter from the West Virginia Office of the
Insurance Commissioner.  (Not. of Rem. ¶ 11; 1/8/2008 Ins. Comm.
Letter, Not. of Rem., ex. 1).  In pertinent part, that letter
provides,

> It is the Office of the Insurance Commissioner's
> enforcement position that debt waiver/cancellation
> contracts are not considered insurance if they are
> issued by the creditor/lender and if the following
> factors are met:
>> ➢ The borrower (retail customer) is not
>> required to enter into the debt cancellation
>> contract;
>> ➢ The contracts are incidental to the
>> lender's financially-related services and are
>> not a profit center;
>> ➢ The debt cancellation contract provides
>> only for waiver of the loan balance or debt
>> and for no other benefits to the borrower;
>> ➢ The lender's fee for the contract does not
>> vary with the borrower's age, health or other
>> underwriting standards; and
>> ➢ The lender neither states nor implies that
>> the contract is insurance.

(Id.)  BB&T has included in the record other letters from the insurance commissioner containing the same, or substantially the same, language.  (5/15/2001, 11/26/2002, 3/28/2005, Ins. Comm. Letters, BB&T Mot. to Dismiss, ex. B).  First, BB&T's contention that the insurance commissioner's position, as expressed in the letters, "is entitled to great weight" is an overstatement. (Reply to Resp. to BB&T's Mot. to Dismiss at 6).[13]  Under West Virginia law, the insurance commissioner's position is neither a legislative nor interpretive rule.  W Va. Code § 29A-1-2(c) and (d).  Even if the guidance offered by the letters constituted an interpretive rule it would be entitled "only to the weight that . . . [its] inherent persuasiveness commands."  Family Med. Imaging v. W. Va. Healthcare Auth., 624 S.E.2d 493, 498 (W. Va. 2005) (quoting Appalachian Power Co. v. State Tax Dep't of W. Va., 466 S.E.2d 424, 434 (W. Va. 1995).  Under federal law, agency interpretations "contained in formats such as opinion letters are 'entitled to respect' . . . but only to the extent that those interpretations have the 'power to persuade.'"  Christensen v. Harris County, 529 U.S. 576, 587 (2000) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  Second, the deference

---

[13] The court offers no opinion as to the merits of BB&T's motion to dismiss.  The arguments presented in BB&T's and Dalton's motions to dismiss are considered only to the extent they are relevant to the issue of fraudulent joinder.

sought does not lead to the consequence desired.  Plaintiff's
affidavit states that "I was led to believe that . . . [the
Payment Protection Contract] was necessary to obtain the loan."
(Justice Aff. ¶ 1, Mot. to Remand, ex. 1).  And further that "I
was . . . led to believe that I was purchasing an insurance
policy."  (Id.)  Thus, if the insurance commissioner's position
is accepted, under the circumstances described by the plaintiff
the Payment Protection Contract may well constitute insurance.

Finally, citing to W. Va. Code R. § 106-11-6,[14] BB&T
argues "West Virginia's division of Banking has promulgated
regulations recognizing the distinction between insurance and
debt cancellation contracts with respect to state chartered banks
such as BB&T.  The Division of Banking clearly viewed debt
cancellation contracts and insurance contracts as different
products requiring separate treatment in the regulations."  (BB&T
Memo. in Supp. Mot. to Dismiss at 6) (internal citation omitted).
Section 106-11-6, which is promulgated by the West Virginia
Division of Banking, has separate provisions regarding "Fee[s]
for Cancellation of Debt," § 106-11-6(6.1) and "Fee[s] for GAP[15]

----

[14] Section 106-11-6 is titled, "Debt Cancellation Contracts
and Insurance," and regulates the collection of fees in
connection with such financial products.

[15] Guaranteed Automobile Protection.

Insurance for Cancellation of Debt." § 106-11-6(6.2).  BB&T,
however, ignores subsection 6.3 of § 106-11-6 which provides,
"Determination of Insurance-- The Commissioner of Insurance
retains the authority to determine whether any debt cancellation
agreement constitutes an insurance product."  Section 106-11-6,
therefore, says little, if anything, regarding whether the
Payment Protection Contract constitutes insurance.  If anything,
in light of the lack of judicial guidance regarding whether debt
cancellation contracts are insurance, the rule evidences the
possibility that the Payment Protection Contract constitutes
insurance under the law of West Virginia.

       Without resolving whether the Payment Protection
Contract is a contract of insurance, the possibility exists that
it is.  This conclusion is reached largely by negative
implication.  Nothing in either federal law, or the law of West
Virginia, precludes such a finding.  On its face the Payment
Protection Plan is, at least arguably, "a contract whereby one
undertakes to indemnify another or to pay a specified amount upon
determinable contingencies."  W. Va. Code § 33-1-1.  Further, if
plaintiff's assertions regarding the circumstances surrounding
the contract's execution are to be accepted, the Payment
Protection Contract may constitute insurance pursuant to the

position of the insurance commissioner.  Ultimately, the
tribunals best suited to resolve this question of state law are
the state courts of West Virginia.

          Having determined that the Payment Protection Contract
may constitute insurance, the court turns to BB&T's argument that
plaintiff's reasonable expectations claim fails for want of an
allegation that the Payment Protection Contract is ambiguous.
BB&T is correct in stating that, "the doctrine of reasonable
expectations <u>generally</u> applies only to situations where there is
an ambiguous provision in an insurance contract."  (Not. of Rem.
¶ 18) (emphasis added).  <u>See</u> <u>Nat'l Mut. Ins. Co. v. McMahon &</u>
<u>Sons, Inc.</u>, 356 S.E.2d 488, 496 (W. Va. 1987) ("the doctrine of
reasonable expectations is limited to those instances, such as
the present case, in which the policy language is ambiguous.").
This court, however, has noted that the doctrine has been
extended:

> [t]he doctrine of reasonable expectations was once
> considered a canon of construction and thus applied
> only to ambiguous insurance contracts. The doctrine has
> been extended . . . beyond circumstances involving
> ambiguous policy language to include "situations where
> an insurer attempts to deny coverage based on an
> exclusion that was not communicated to the insured, or
> where there is a misconception about the insurance
> purchased."

Lawson v. Am. Gen. Assurance Co., 455 F. Supp. 2d 526, 530-31
(S.D. W. Va. 2006) (quoting Am. Equity Ins. Co. v. Lignetics,
Inc., 284 F. Supp. 2d 399, 406 (N.D. W. Va. 2003)).  In 1991 the
Supreme Court of Appeals of West Virginia held in Keller that if
a creditor "who is an agent for an insurance company, creates a
reasonable expectation of insurance coverage, then both the
insurance company and the creditor would be bound."  403 S.E.2d
at 428.  The court reached this conclusion despite the fact that
the insurance policy at issue was not ambiguous.

        In Costello v. Costello, 465 S.E.2d 620 (W. Va. 1995),
plaintiff was injured while riding a motorcycle owned by her
husband and insured by Allstate Insurance Company.  Under the
policy's unambiguous terms, to be entitled to underinsurance
motor vehicle coverage, plaintiff was required to have been
residing with her husband at the time of the accident.  She was
not.  Following Allstate's denial of coverage, plaintiff sued
Allstate and the insurance agent who sold plaintiff and her
husband the policy.  Advancing a reasonable expectations of
insurance theory of recovery against the agent, plaintiff argued
that the agent "wrongfully failed to cause her to be listed as a
named insured upon . . . [the] policy."  Id. at 622.  Plaintiff's
complaint stated that "[a]t the time said application for

34

Allstate insurance on the Caravan policy was made and taken,
Timothy Costello and Linda Costello reasonably expected that
Linda Costello would be included as an insured person under the
underinsurance coverage and said policy should be reformed to
include said coverage." Id. Despite these averments, the trial
court refused to instruct the jury as to plaintiff's reasonable
expectations theory.  On appeal, the Supreme Court of Appeals
noted that "the Keller case . . . somewhat extended the doctrine
of reasonable expectations of insurance beyond circumstances
involving ambiguous policy language." Id. 623.  Relying on
Keller, the court held "that the circuit court committed
reversible error in refusing to instruct the jury concerning
appellant's theory of reasonable expectations of insurance." Id.
at 625.

          Here, plaintiff contends that Dalton's representations
created a reasonable expectation of insurance.  (Compl. ¶¶ 46-
47).  Whether the Payment Protection Contract is ambiguous is of
no moment.  Under Keller and Costello the possibility exists that
plaintiff will "be able to establish a cause of action against
the in-state defendant in state court." Mayes, 198 F.3d at 464.
Given this "possibility of a right to relief" against Dalton,
Marshall, 6 F.3d at 233, BB&T is unable to shoulder its "heavy

35

burden of proving fraudulent joinder." <u>Mayes</u>, 198 F.3d at 463.
Accordingly, this court lacks subject matter jurisdiction and
plaintiff's motion to remand is granted.[16]


C. Costs and Expenses


        Plaintiff requests an award of attorney fees incurred
in connection with BB&T's removal of this action.  (Mot. to Rem.
at 13).  "An order remanding the case may require payment of just
costs and any actual expenses including attorney's fees, incurred
as a result of removal."  28 U.S.C. § 1447(c).  The Supreme Court
has held that "[a]bsent unusual circumstances, courts may award
attorney's fees under § 1447(c) only where the removing party
lacked an objectively reasonable basis for seeking removal.
Conversely, when an objectively reasonable basis exists, fees
should be denied."  <u>Martin v. Franklin Capital Corp.</u>, 546 U.S.
132, 141 (2005).  BB&T's removal was objectively reasonable.
This is particularly so in light of the fact that the content of
the plaintiff's affidavit was not disclosed until after the case
was removed.  <u>Id.</u> ("failure to disclose facts necessary to

---

        [16] Lacking the power to do so, the court does not reach the
defendants' motions to dismiss or plaintiff's motion to amend the
complaint.

36

determine jurisdiction may affect the decision to award attorney's fees."). Accordingly, plaintiff's request for attorney fees is denied.

                              IV.

        It is, accordingly, ORDERED as follows:

1.   Plaintiff's motion to remand be, and it hereby is, granted.

2.   Plaintiff's request for attorney fees be, and it hereby is, denied.

3.   This action be, and it hereby is, remanded for all further proceedings to the Circuit Court of Boone County.

        The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record and a certified copy to the clerk of court for the Circuit Court of Boone County.

                    DATED: March 24, 2009

                    John T. Copenhaver, Jr.
                    United States District Judge

                              37